**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JONATHAN MARGOLIS, *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>USA WASTE-MANAGEMENT RESOURCES, LLC and WASTE MANAGEMENT, INC.,<br><br>Defendants. | Case No.: 4:26-cv-10199<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Jonathan Margolis ("Plaintiff" or "Mr. Margolis") brings this Class Action Complaint against Defendants USA Waste-Management Resources, LLC ("WMR") and Waste Management, Inc. ("WMI") (together, "WM" or "Defendants") individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsel's investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action arises out of a data breach ("Data Breach") involving WM, the Houston-based provider of waste collection, recycling, and disposal services, which reports approximately 60,500 full-time employees.[1]

[1] Waste Mgmt., Inc., Annual Report (Form 10-K) 4, 12 (Feb. 9, 2026), https://www.sec.gov/Archives/edgar/data/823768/000110465926012049/wm-20251231x10k.htm (last visited Nov. 20, 2026).

2. Plaintiff brings this Complaint against WM for its failure to properly secure and safeguard the personally identifiable information that it collected and maintained as part of its regular business practices, including Plaintiff's and Class Members' names and Social Security numbers (collectively defined herein as "PII" or "Private Information").

3. Between June 17, 2026, and September 3, 2026, an unauthorized party "used sophisticated social engineering tactics to access data from [WM's] systems."[2] WM did not become aware of the intrusion until September 2, 2026, 77 days after it began. WM then took another 34 days, until October 6, 2026, to determine that Plaintiff's and Class Members' Private Information had been affected and did not send written notice of the Data Breach to Plaintiff and Class Members until November 6, 2026, 65 days after WM discovered the intrusion and 142 days after the intrusion itself.

4. This is not WM's first data breach. In January 2021, an unauthorized actor entered WM's environment, accessed files containing the names and Social Security numbers of current and former employees and their dependents, and took some of those files, in a breach WMR reported affected 268,510 individuals. Five years later, WM still held the Social Security number of Plaintiff, who worked for WM for approximately two months in 2020, on systems that an outsider could reach by deceiving WM's personnel.

5. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of WM's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of WM's inadequate

[2] Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals 1 (Nov. 6, 2026) (sample notice submitted to the California Attorney General), https://oag.ca.gov/system/files/WM%20AG%20Notice%20-%20Consumer%20Notification%20Example%20%28CA%29%20%28Redacted%29.pdf (last visited Nov. 20, 2026).

information security practices; and (iii) effectively secure its systems containing Private Information using reasonable and effective security procedures free of vulnerabilities and incidents, including by training its personnel to recognize and resist social engineering and by disposing of Private Information it no longer needed. WM's conduct amounts at least to negligence and violates federal and state statutes.

6. Plaintiff and Class Members have suffered injury as a result of WM's conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in WM's possession and is subject to further unauthorized disclosures so long as WM fails to undertake appropriate and adequate measures to protect the Private Information.

7. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to WM's inadequate data security practices.

///

///

///

## PARTIES

***Plaintiff***

8. Plaintiff Jonathan Margolis is a resident and citizen of the Commonwealth of Pennsylvania.

***Defendants***

9. Defendant USA Waste-Management Resources, LLC is a New York limited liability company with its principal place of business at 800 Capitol Street, Suite 3000, Houston, Texas 77002.[3] WMR is a subsidiary of WMI and, upon information and belief, is the WM entity that employs much of WM's workforce and maintains its human resources records. WMI's executive officers have employment and compensation agreements with WMR.[4] For purposes of 28 U.S.C. § 1332(d), WMR is a citizen of New York and Texas. *See* 28 U.S.C. § 1332(d)(10).

10. Defendant Waste Management, Inc. is a Delaware corporation with its principal executive offices at 800 Capitol Street, Suite 3000, Houston, Texas 77002.[5] WMI is a holding company, and "all operations are conducted by its subsidiaries."[6] WMI sets the cybersecurity program that governs its subsidiaries' systems: its Chief Information Security Officer and his team "are responsible for leading enterprise-wide cybersecurity strategy, policy, standards, architecture and processes."[7] For purposes of 28 U.S.C. § 1332(d), WMI is a citizen of Delaware and Texas.

---

[3] Waste Mgmt., Inc., Subsidiaries of the Registrant (Exhibit 21.1 to Annual Report (Form 10-K)) (Feb. 9, 2026), https://www.sec.gov/Archives/edgar/data/823768/000110465926012049/wm-20251231xex21d1.htm (last visited Nov. 20, 2026); Off. of the Tex. Att'y Gen., Data Security Breach Reports, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Nov. 20, 2026) (entry for USA Waste-Management Resources, LLC, published Nov. 10, 2026).

[4] Waste Mgmt., Inc., Annual Report (Form 10-K), *supra* note 1, at 138.

[5] Waste Mgmt., Inc., Annual Report (Form 10-K), *supra* note 1, at 4.

[6] *Id.*

[7] Waste Mgmt., Inc., Annual Report (Form 10-K), *supra* note 1, at 38.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members exceeds 100: WM reported to the Texas Attorney General that the Data Breach affected 6,875 Texans and to the South Carolina Department of Consumer Affairs that it affected 1,292 South Carolina residents.[8] Minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A) because Plaintiff, a citizen of Pennsylvania, is a citizen of a State different from each Defendant.

12. This Court has personal jurisdiction over Defendants because each Defendant maintains its principal place of business in this District, conducts substantial business in Texas, and, upon information and belief, made the data security decisions giving rise to Plaintiff's claims in this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### *WM's Business*

14. WM provides waste collection, transfer, recycling, and disposal services across North America. As of December 31, 2025, WMI reported approximately 60,500 full-time employees, approximately 53,600 of them in the United States.[9]

---

[8] S.C. Dep't of Consumer Affs., Security Breach Notices, https://consumer.sc.gov/identity-theft-unit/security-breach-notices (last visited Nov. 20, 2026) (entry for USA Waste-Management Resources, LLC, reported Nov. 6, 2026).
[9] Waste Mgmt., Inc., Annual Report (Form 10-K), *supra* note 1, at 12.

15. In the ordinary course of its business, WM collects and maintains highly sensitive personal information belonging to its current and former employees, including their names and Social Security numbers. Because WM requires its workforce to hand over this information as a condition of employment, the security of that data is a core obligation of WM's business, not an incidental one.

16. Plaintiff's and the Class's Private Information was collected and maintained by WM in connection with its business.

17. WM requires its employees to provide sensitive Private Information — including Social Security numbers — as a condition of employment. Plaintiff, a former employee of WM, was required to provide his Private Information to WM to obtain that employment.

18. WM collected, stored, and maintained this Private Information on its computer systems and networks.

19. Based on WM's possession and control of Plaintiff's and Class Members' Private Information and the known sensitivity of that information, WM undertook legal duties to maintain the confidentiality, integrity, and security of the Private Information. These duties included ensuring that WM's computer systems and data-handling practices complied with applicable federal and state laws, regulations, industry standards, and the reasonable expectations of Plaintiff and Class Members.

20. WM publicly acknowledges this obligation. WMI tells investors that its business "necessitates the processing, collection, use, storage and transmission of numerous classes of sensitive and/or confidential information," including "private and sensitive employment-related personal data."[10] WM tells the public that "[p]rotecting information assets, digital operations,

[10]Waste Mgmt., Inc., Annual Report (Form 10-K), *supra* note 1, at 33.

employee data, customer data and business continuity is an important component of our enterprise risk management approach."[11]

***The Data Breach***

21. WM was the victim of a cybersecurity incident involving unauthorized access to its systems. By WM's own account, an unauthorized party used social engineering to access data from WM's systems between June 17, 2026, and September 3, 2026.

22. In its Notice of Data Breach letter dated November 6, 2026 (the "Notice Letter"), WM disclosed the incident as follows:

> What Happened? On September 2, 2026, we became aware of a potential issue involving a limited portion of our information systems. We immediately took steps to secure our systems and, with the assistance of counsel and a third-party forensics team, investigate the extent of this activity. We then determined that an unauthorized party used sophisticated social engineering tactics to access data from our systems between June 17, 2026, and September 3, 2026.[12]

23. The Notice Letter further states that, "[o]n October 6, 2026, we determined that the sensitive personal information of certain individuals, including you, may have been affected. Such sensitive personal information includes your Social Security Number."[13] WM reported the Data Breach to the California Attorney General,[14] to the Texas Attorney General, reporting that it affected 6,875 Texans,[15] and to the South Carolina Department of Consumer Affairs, reporting that it affected 1,292 South Carolina residents.[16]

---

[11]WM, *Cybersecurity & AI*, https://sustainability.wm.com/sustainability-a-z/cybersecurity/ (last visited Nov. 20, 2026).
[12]Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals, *supra* note 2, at 1.
[13]*Id.*
[14]Cal. Att'y Gen., *Data Security Breach Reports: USA Waste-Management Resources, LLC*, https://oag.ca.gov/ecrime/databreach/reports/sb24-632489 (last visited Nov. 20, 2026).
[15]Off. of the Tex. Att'y Gen., *supra* note 3.
[16]S.C. Dep't of Consumer Affs., *supra* note 8.

24. The Notice Letter states that WM "ha[s] implemented additional technical security measures to further protect our systems."[17] Those measures were available to WM before the Data Breach. None of them was in place, or effective, during the 78 days in which the unauthorized party had access to WM's systems.

25. Omitted from the Notice Letter were the details of the root cause of the Data Breach, the social engineering technique the unauthorized party used, which of WM's personnel or accounts were deceived or compromised, why the intrusion went undetected for 77 days, why WM still held the Social Security numbers of former employees whose employment had ended years earlier, the identity of the threat actor, and whether any ransom was demanded or paid. The Notice Letter also does not explain why WM needed 34 days after discovering the intrusion to determine whose Private Information was involved, or why it waited another month after that determination to notify affected individuals. The Notice Letter states that it "was not delayed by law enforcement."[18] To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

26. This disclosure was untimely. Texas law requires a person who conducts business in Texas to disclose a breach "without unreasonable delay and in each case not later than the 60th day after the date on which the person determines that the breach occurred," except at the request of law enforcement or "as necessary to determine the scope of the breach and restore the reasonable integrity of the data system." Tex. Bus. & Com. Code Ann. § 521.053(b). WM knew no later than September 3, 2026, that an unauthorized party had accessed data on its systems, and no law

---

[17]Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals, *supra* note 2, at 1.
[18]Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals, *supra* note 2, at 4.

enforcement agency delayed notice. WM's notice, sent 64 days after September 3, 2026, was not made without unreasonable delay.

27. Without these details — and because of the more than two-month delay in receiving them — Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach was severely diminished.

28. Despite WM's limited disclosure about the root cause of this incident, several facts may be gleaned from the Notice Letter, including: (a) that this Data Breach involved unauthorized activity by a third party; (b) that the unauthorized party gained access by deceiving WM's personnel through social engineering; (c) that the unauthorized party had access to WM's systems for 78 days, including at least one day after WM discovered the intrusion; and (d) that the data the unauthorized party accessed included Social Security numbers.

29. WM did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it was no longer needed, causing the exposure of Private Information. The Notice Letter does not state that the compromised Private Information was encrypted, and, upon information and belief, it was not.

30. Upon information and belief, Plaintiff's and Class Members' Private Information has been or will be published, trafficked, and sold on the dark web, as that is the *modus operandi* of cybercriminals who access data of this type. WM's Notice Letter acknowledges the risk, encouraging recipients "to remain vigilant against incidents of identity theft and fraud, to review your account statements, and to monitor your credit reports for suspicious activity."[19]

///

[19] Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals, *supra* note 2, at 2.

***Social Engineering Is a Known and Preventable Threat***

31. The unauthorized party reached WM's systems through social engineering, which the National Institute of Standards and Technology describes as "an attempt to trick an individual into revealing information or taking an action that can be used to breach, compromise, or otherwise adversely impact a system."[20] Federal agencies have warned large companies about this threat for years. A joint advisory by the Federal Bureau of Investigation and the Cybersecurity and Infrastructure Security Agency, last revised July 29, 2025, describes a cybercriminal group that "targets large companies and their contracted information technology (IT) help desks" and directs organizations to "[e]nable and enforce phishing-resistant multifactor authentication (MFA)."[21] Reasonable defenses against social engineering include, at a minimum:

a. training that includes practical exercises, such as "no-notice social engineering attempts to collect information, gain unauthorized access, or simulate the adverse impact of opening malicious email attachments," and that teaches personnel to recognize and report social engineering;[22]

b. phishing-resistant multifactor authentication, which, unlike passwords and one-time codes, cannot be talked out of an employee or a help desk;[23] and

[20]Nat'l Inst. of Standards & Tech., Special Publication 800-53 Rev. 5, *Security and Privacy Controls for Information Systems and Organizations* 61 (Sept. 2020), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf (last visited Nov. 20, 2026) (control AT-2(3)).

[21]Fed. Bureau of Investigation & Cybersecurity & Infrastructure Sec. Agency *et al.*, *Scattered Spider*, Advisory AA23-320A (rev. July 29, 2025), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-320a (last visited Nov. 20, 2026) (citations omitted).

[22]Nat'l Inst. of Standards & Tech., *supra* note 20, at 60–61 (controls AT-2(1), AT-2(3)).

[23]Fed. Bureau of Investigation & Cybersecurity & Infrastructure Sec. Agency *et al.*, *supra* note 21; *see also* 16 C.F.R. § 314.4(c)(5) (2026).

c. access controls that give employees access to Private Information only on a "need to know" basis, so that deceiving a single employee does not give an outsider access to the Social Security numbers of current and former employees.[24]

32. WM knew all of this. WM represents that its employees can find intranet guidance on "how to identify and resist social engineering attempts,"[25] and WMI tells investors that its Board's oversight includes "regular simulated phishing tests and third-party penetration testing."[26] Whatever training and testing WM conducted, it did not work: an outsider deceived WM's personnel, reached systems holding Social Security numbers, and remained there for 78 days.

***WM Kept Former Employees' Social Security Numbers It No Longer Needed***

33. Plaintiff worked for WM for approximately two months, from October to November 2020. When the Data Breach began in June 2026, more than five and one-half years had passed since his employment ended. Upon information and belief, no legal requirement obligated WM to keep his Social Security number on its live systems that long: federal law requires employers to keep Form I-9 for "three years after the date of the hire or one year after the date the individual's employment is terminated, whichever is later," 8 C.F.R. § 274a.2(b)(2)(i)(A), and to keep employment tax records "for at least four years after the due date of such tax for the return period to which the records relate, or the date such tax is paid, whichever is the later," 26 C.F.R. § 31.6001-1(e)(2). The Federal Trade Commission instructs businesses to "[h]old on to information only as long as you have a legitimate business need."[27]

---

[24] *Start with Security: A Guide for Business*, FTC, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Nov. 20, 2026).
[25] WM, *supra* note 11.
[26] Waste Mgmt., Inc., Annual Report (Form 10-K), *supra* note 1, at 39.
[27] *Start with Security: A Guide for Business*, *supra* note 24.

34. WM's own privacy disclosures acknowledge the obligation, stating that WM "expect[s] to delete your personal information (at the latest) once there is no longer any local, state, federal, and other legal requirement or legitimate business purpose for retaining your personal data."[28] Had WM disposed of former employees' Private Information once the legal and business need for it ended — or at least removed it from systems accessible through social engineering — Plaintiff's and many Class Members' Private Information would not have been exposed in the Data Breach.

***Data Breaches Are Preventable***

35. The Data Breach was preventable. WM could have prevented the unauthorized access to Plaintiff's and Class Members' Private Information by, among other things, training its personnel to recognize and resist social engineering, encrypting the Private Information in its custody, segmenting its network, requiring phishing-resistant multifactor authentication for access to systems containing Private Information, limiting employees' access to Private Information to what their jobs required, disposing of Private Information it no longer needed, timely remediating known exploited vulnerabilities in its internet-facing systems, and adopting the additional safeguards described below.

36. None of those safeguards is novel, experimental, or proprietary. Each has been published for years by the federal government and by industry consensus bodies, is available at no cost, and is directed expressly to organizations of every size and in every sector. The National

[28] WM, *Privacy Notice at Collection for California Residents* (last updated Nov. 5, 2026), https://www.wm.com/us/en/privacy/california-notice (last visited Nov. 20, 2026).

Institute of Standards and Technology ("NIST") states the obligation plainly: "An organization must protect its information from unauthorized access and disclosure."[29]

37. How unauthorized actors gain access to systems holding personal information is well documented and has been for years. The Verizon 2026 Data Breach Investigations Report, which analyzed more than 22,000 confirmed data breaches across 145 countries, found that organizations fully remediated only 26% of the vulnerabilities appearing in the federal government's Known Exploited Vulnerabilities catalog, down from 38% the prior year, and took a median of 43 days to do so.[30] Credential abuse remained pervasive, appearing at some point in the attack chain in 39% of breaches, and breaches involving a third party rose to 48% of the dataset, with many third-party cloud intrusions traceable to absent multifactor authentication, unrotated credentials, or unenforced least privilege. Personal data was among the information taken in 23% of all breaches studied.

38. Federal guidance addresses precisely these avenues of unauthorized access. The Cybersecurity and Infrastructure Security Agency ("CISA"), the Federal Bureau of Investigation ("FBI"), the National Security Agency ("NSA"), and the Multi-State Information Sharing and Analysis Center ("MS-ISAC") jointly publish a consolidated catalog of prevention measures organized by initial access vector, applicable to intrusions in which unauthorized actors exfiltrate data whether or not they also deploy encryption, and aligned to a "minimum set of practices and

---

[29]William Fisher *et al.*, Nat'l Inst. of Standards & Tech., *Data Confidentiality: Identifying and Protecting Assets Against Data Breaches, Volume A: Executive Summary* 1, NIST SP 1800-28 (Feb. 2024), https://doi.org/10.6028/NIST.SP.1800-28 (last visited Oct. 26, 2026).

[30]Verizon Bus., *2026 Data Breach Investigations Report* 5, 15–17, 21, 36 (2026), https://www.verizon.com/business/resources/T161/reports/2026-dbir-data-breach-investigations-report.pdf (last visited Oct. 26, 2026).

protections" the federal government recommends every organization implement.[31] Applying that guidance, WM could and should have, before the Data Breach: prepared for a foreseeable intrusion by maintaining tested, offline, encrypted backups and a written and regularly exercised incident response plan; closed the internet-facing exposures that intruders exploit first, including exposed remote-access services, unpatched known exploited vulnerabilities, and insecure file-sharing protocols; protected credentials through phishing-resistant multifactor authentication, least-privilege administration, and enforced password and account-lockout policies; defended against phishing through user training, email authentication, gateway filtering, and disabled macros; detected intrusion and pre-exfiltration activity through centrally managed endpoint protection, application allowlisting, and intrusion detection; managed the risk posed by third parties and managed service providers through diligence, contractual security requirements, and least-privilege access; and hardened its environment generally through asset inventory, network segmentation, domain-controller hardening, restricted administrative tooling, and centralized log retention.

39. The FBI publishes materially the same mitigations in its annual Internet Crime Report, directing organizations to maintain immutable backups, eliminate default credentials, remove unnecessary protocols, enforce least privilege, deploy multifactor authentication across all services, log and detect lateral movement, segment networks, and keep systems current. The FBI

---

[31] Cybersecurity & Infrastructure Sec. Agency, Fed. Bureau of Investigation, Nat'l Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* 3, 5–12, 14–20 (Oct. 2023), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited Oct. 26, 2026).

states that timely patching is "one of the most efficient and cost-effective steps" an organization can take to minimize its exposure.[32]

40. Regulators have codified the same measures. The Federal Trade Commission's ("FTC") Safeguards Rule requires covered entities to implement and periodically review access controls that authenticate and permit access only to authorized users, maintain a data and systems inventory, protect customer information by encryption both in transit over external networks and at rest, and implement "multi-factor authentication for any individual accessing any information system."[33]

41. The consequences of failing to implement these measures were equally well known. In 2025 alone, the FBI's Internet Crime Complaint Center received 1,008,597 complaints reporting $20.877 billion in losses. Personal data breach was among the most frequently reported crime types, with 67,456 complaints reporting $1,314,923,988 in losses, and complaints categorized as data breach reported an additional $435,240,992 in losses.[34]

42. Had WM implemented these readily available, publicly recommended measures — or any meaningful subset of them — the unauthorized access would have been prevented, or its scope and duration would have been materially limited, and Plaintiff's and Class Members' Private Information would not have been exposed.

43. The occurrence of the Data Breach indicates that WM failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of the individuals identified in WM's breach

---

[32]Fed. Bureau of Investigation, Internet Crime Complaint Ctr., *2025 Internet Crime Report* 15 (2026), https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf (last visited Oct. 26, 2026).
[33]16 C.F.R. § 314.4(c)(1)–(3), (5) (2026).
[34]Fed. Bureau of Investigation, *2025 Internet Crime Report*, *supra* note 32, at 6–8.

notification filings with the California and Texas Attorneys General and the South Carolina Department of Consumer Affairs.[35] Upon information and belief, given WM's nationwide workforce, the individuals whose Private Information was exposed include residents of numerous states, and the full number and state-by-state distribution of the affected population have not been publicly disclosed.

***WM Acquires, Collects, and Stores Private Information***

44. As a condition of their employment with WM, Plaintiff and Class Members were required to provide their Private Information to WM.

45. WM retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, WM would be unable to employ and pay its workforce.

46. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, WM assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

47. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on WM to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

48. WM could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members, and by deleting the Private Information it no longer needed.

---

[35] *See* Cal. Att'y Gen., *supra* note 14; Off. of the Tex. Att'y Gen., *supra* note 3; S.C. Dep't of Consumer Affs., *supra* note 8.

***WM Knew or Should Have Known of the Risk Because Companies in Possession of Private Information Are Particularly Susceptible to Cyberattacks***

49. Data thieves regularly and deliberately target companies like WM because of the volume and sensitivity of the Private Information those companies hold. WM knew and understood that unprotected Private Information is valuable and highly sought after by criminal actors who seek to illegally monetize that Private Information through unauthorized access, resale, and downstream fraud.

50. WM's exposure was heightened by the nature and volume of the information it held. WM employs tens of thousands of people and, over time, accumulates the Private Information of far more former employees. A single successful intrusion at WM therefore yields a criminal the names and Social Security numbers of a large population of current and former employees — everything needed to impersonate a victim, open new accounts, and file fraudulent tax returns.

51. The market for stolen Private Information is mature and liquid, and it is indifferent to the identity of the custodian from whom the data was taken. In 2024, the FBI's Internet Crime Complaint Center received 859,532 complaints reporting approximately $16.6 billion in losses, at the time the highest annual total in the Center's history.[36] Unlike a password or a payment card number, a Social Security number cannot be reset or reissued at will, and WM understood that Private Information in its possession would retain value to criminals indefinitely.

52. WM's data security obligations were therefore particularly important given the sustained and well-publicized increase in cyberattacks and data breaches targeting entities that collect and store Private Information, like WM, in the years preceding the Data Breach.

---

[36]Fed. Bureau of Investigation, Internet Crime Complaint Ctr., *2024 Internet Crime Report* 4 (Apr. 2025), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf (last visited Oct. 26, 2026).

53. The Identity Theft Resource Center ("ITRC"), which has tracked publicly reported United States data compromises since 2005, reported in January 2025 that 3,158 data compromises occurred in 2024 — within 44 events of the all-time record set in 2023 (3,202) — and that the number of data breach notices issued in 2024 (1,728,519,397) increased 312% over 2023 (419,337,446).[37] The ITRC further concluded that better cyber practices and requirements could have prevented at least 196 of those compromises and more than 1.2 billion victim notices.[38] That report was public more than 16 months before the Data Breach.

54. More than 13 months before the Data Breach, Verizon published its 2025 Data Breach Investigations Report, analyzing 22,052 security incidents and 12,195 confirmed data breaches across 139 countries, the highest number of breaches Verizon had ever analyzed in a single edition of the report, then in its 18th annual installment.[39] Verizon reported that credential abuse (22%) and exploitation of vulnerabilities (20%) were the leading initial access vectors.

55. Verizon also reported that the share of breaches involving a third party had doubled in a single year, from 15% to 30%. Verizon separately found that the median time to remediate leaked credentials discovered in a public code repository was 94 days.[40]

---

[37]Press Release, Identity Theft Res. Ctr., *Identity Theft Resource Center's 2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices* (Jan. 28, 2025), https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/ (last visited Oct. 26, 2026).

[38]*Id.*

[39]Verizon Bus., *2025 Data Breach Investigations Report* 5, 10 (Apr. 23, 2025), https://www.verizon.com/business/resources/reports/2025-dbir-data-breach-investigations-report.pdf (last visited Oct. 26, 2026); *see also* Press Release, Verizon, *Verizon's 2025 Data Breach Investigations Report: Alarming Surge in Cyberattacks Through Third-Parties* (Apr. 23, 2025), https://www.verizon.com/about/news/2025-data-breach-investigations-report (last visited Oct. 26, 2026).

[40]Verizon Bus., *2025 Data Breach Investigations Report*, *supra* note 39, at 11.

56. WM's knowledge was not merely constructive. In May 2021, WMR notified current and former employees, and dependents of current or former employees, that "an unauthorized actor entered our environment between January 21 and 23, 2021, accessed certain files, and took a limited number of files," which contained "name, Social Security number or National ID, date of birth, and driver's license number."[41] WMR reported that the 2021 breach affected 268,510 individuals.[42] The breach led to class litigation against WM, including in this District, and to a class settlement. *See In re Waste Mgmt. Data Breach Litig.*, No. 1:21-cv-06199-DLC (S.D.N.Y. 2023), ECF No. 72 (order preliminarily approving class settlement).

57. WM was therefore on actual notice — from its own prior breach and the litigation over it — that the employee records on its systems, including the records of former employees, were a target. The Data Breach is the same failure, repeated: an intrusion into WM's systems, followed by the exposure of the Social Security numbers of the people who work, or once worked, for WM.

58. In light of recent, highly publicized data breaches at other sophisticated organizations, each of which occurred and was widely reported before the Data Breach, WM knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals. Among many others:

[41] Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals 1 (May 28, 2021) (sample notice submitted to the South Carolina Department of Consumer Affairs), https://www.consumer.sc.gov/sites/consumer/files/Documents/Business%20Resources%20Laws/Related%20Laws/Breaches/2021/USAWasteManagement.pdf (last visited Nov. 20, 2026).

[42] Ind. Att'y Gen., *Data Breach Year to Date Report 2021*, at 21, https://secure.in.gov/attorneygeneral/consumer-protection-division/id-theft-prevention/files/Data-Breach-Year-to-date-Report-2021-1.pdf (last visited Nov. 20, 2026) (entry for USA Waste-Management Resources, LLC).

a. **Change Healthcare** — a February 2024 ransomware intrusion attributed to the BlackCat/ALPHV group; by January 2025, its parent company had publicly confirmed that approximately 190 million individuals were affected, making it the largest healthcare data breach on record;[43]

b. **PowerSchool** — a December 2024 intrusion, disclosed in January 2025, in which a single compromised credential was used to access a customer support portal that did not require multifactor authentication, exposing the personal information of approximately 62 million students and 9.5 million educators, including Social Security numbers;[44] and

c. **23andMe, Inc.** — an October 2023 credential-stuffing campaign in which unauthorized access to roughly 14,000 accounts was leveraged through an opt-in profile-sharing feature to reach the personal information of approximately 6.9 million individuals.[45]

***Value of Personally Identifiable Information***

59. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other

[43] *UnitedHealth Says Hack at Tech Unit Impacted 190 Million People*, Reuters (Jan. 24, 2025), https://www.reuters.com/business/healthcare-pharmaceuticals/unitedhealth-confirms-190-million-americans-affected-by-hack-tech-unit-2025-01-24/ (last visited Oct. 26, 2026).
[44] Carly Page, *What PowerSchool Won't Say About Its Data Breach Affecting Millions of Students*, TechCrunch (Mar. 10, 2025), https://techcrunch.com/2025/03/10/what-powerschool-isnt-saying-about-its-massive-student-data-breach/ (last visited Oct. 26, 2026).
[45] Off. of the Priv. Comm'r of Can., *Backgrounder: Summary of Joint Investigation into Data Breach at 23andMe by the Privacy Commissioner of Canada and the UK Information Commissioner* (June 17, 2025), https://www.priv.gc.ca/en/opc-news/news-and-announcements/2025/bg_23andme_250617/ (last visited Oct. 26, 2026).

information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[46]

60. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change: names and Social Security numbers.

61. Social Security numbers cannot be canceled, revoked, or reissued in the ordinary course. Unlike a payment card, which a financial institution can cancel and replace within days, a Social Security number is a lifetime identifier. The Social Security Administration will assign a replacement number only in narrow circumstances: the numberholder must have already exhausted efforts to resolve the misuse, someone must still be using the original number, and the numberholder must document ongoing problems caused by the misuse.[47] A 2025 House committee report states that agency policy requires a showing that the misuse "caused actual harm or disadvantage to the numberholder," and that the harm generally must have occurred within the two years preceding the application.[48] A person whose Social Security number is exposed in a data breach therefore cannot obtain a replacement as a precaution. He must first be victimized, and remain victimized, before relief is even available. Even then, the agency cautions that "using a

---

[46] 16 C.F.R. § 603.2(a)–(b) (2026).
[47] Soc. Sec. Admin., Pub. No. 05-10064, *Identity Theft and Your Social Security Number* (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 26, 2026).
[48] H.R. Rep. No. 119-329, at 3–4 (2025).

new number won't guarantee you a fresh start," because credit reporting companies and other institutions retain records under the original number, and the absence of credit history under a new number can itself impair the victim's ability to obtain credit.[49]

62. Because Social Security numbers are permanent, criminals have measurably shifted their targeting toward them. The ITRC's 2025 Annual Data Breach Report — its twentieth annual edition — documents a five-year reallocation of criminal effort toward "static identifiers that facilitate long-term identity fraud" and away from data that victims can readily replace, such as credit card numbers.[50] Compromises involving Social Security numbers nearly doubled over that period, from 1,146 in 2021 to 2,236 in 2025. Driver's license numbers rose from 456 to 1,094, and bank account numbers from 410 to 1,099, over the same period. Against a 2025 total of 3,322 reported data compromises, Social Security numbers were among the data exposed in roughly two-thirds of all reported incidents. The market for stolen data has priced in what WM ignored: information that cannot be canceled retains its value to criminals indefinitely.

63. The combination of these data elements is precisely what legislatures have identified as warranting statutory protection. Texas, where WM is headquartered, defines "sensitive personal information" to include an individual's name in combination with a Social Security number.[51] The legislative judgment that this information requires protection has already been made, and WM is not entitled to relitigate it.

64. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

---

[49]Soc. Sec. Admin., *supra* note 47.
[50]Identity Theft Res. Ctr., *2025 Annual Data Breach Report* 9, 29 (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited Oct. 26, 2026).
[51]Tex. Bus. & Com. Code Ann. § 521.002(a)(2).

65. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[52]

66. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***WM Fails to Comply with Industry Standards***

67. As alleged above, organizations that collect and retain Private Information are recognized, high-value targets precisely because of the volume and sensitivity of what they hold. The specific attack methods used against such organizations are not novel or unforeseeable; they are catalogued, quantified, and published annually. Verizon's 2025 Data Breach Investigations Report, published in April 2025, reported that the share of breaches involving a third party had doubled year over year, from 15% to 30%. Verizon's 2026 report, drawn from more than 31,000 security incidents and over 22,000 confirmed breaches across 145 countries, confirms the persistence of those same patterns, identifying vulnerability exploitation as the leading initial-access vector at approximately 31% of breaches and reporting a further increase in third-party

[52] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, at 29 (June 2007)*, https://www.gao.gov/new.items/d07737.pdf (last visited Oct. 26, 2026) [*hereinafter* GAO Report].

involvement.[53] WM had access to the same published information as every other participant in the waste services industry and was on notice, before the Data Breach, of the attack patterns that caused it.

68. Against that known threat, a consensus baseline of safeguards has emerged that any organization holding Private Information is expected to implement. Those safeguards include, at a minimum: (a) data minimization and enforced retention and secure-deletion schedules, so that Private Information is not retained after the business purpose for which it was collected has expired; (b) maintaining a complete, current, and documented inventory of information systems, software, and the data each holds; (c) phishing-resistant multifactor authentication for all remote access, all privileged accounts, all email and VPN access, and all administrative interfaces; (d) enforcement of least privilege and separation of duties, elimination of standing and shared administrative credentials, and periodic review of access entitlements; (e) network segmentation sufficient to prevent an intrusion in one environment from reaching Private Information stored in another; (f) encryption of Private Information both at rest and in transit, with cryptographic key management appropriate to current standards; (g) endpoint detection and response capabilities deployed across the environment, rather than signature-based antivirus alone; (h) centralized logging and continuous monitoring, with retention sufficient to permit forensic investigation, and alerting on anomalous authentication, privilege escalation, and bulk data egress; (i) risk-prioritized vulnerability management and timely patching, including remediation of vulnerabilities listed in CISA's Known Exploited Vulnerabilities catalog within the published due dates; (j) hardening and minimization of the internet-facing attack surface; (k) segregated, immutable, and regularly tested

[53]Verizon Bus., *2025 Data Breach Investigations Report*, *supra* note 39; Verizon Bus., *2026 Data Breach Investigations Report*, *supra* note 30.

backups; (l) documented third-party and vendor risk management, including contractual security requirements and periodic reassessment; (m) recurring role-based security awareness and phishing training; and (n) a written incident response plan that is exercised and tested.

69. WM owed Plaintiff and the Class a duty to exercise reasonable care in collecting, storing, and safeguarding the Private Information that WM required them to provide as a condition of their employment. That duty arises at common law and exists independently of any contractual obligation between the parties. The content of that duty is not left to WM's discretion. It is supplied by the recognized cybersecurity frameworks by which industry participants, federal agencies, and state enforcement authorities measure security readiness, the same frameworks WM failed to satisfy.

70. WM collected Plaintiff's and Class Members' Private Information in connection with their employment and retained that Private Information for a period exceeding any legitimate business need, including, upon information and belief, the Private Information of former employees such as Plaintiff. WM's affirmative decision to retain that Private Information, rather than to delete it or render it unreadable, created the foreseeable risk that criminal actors would target WM's systems in order to obtain it, which is precisely what occurred.

71. WM failed to implement the foregoing safeguards. The particulars of WM's security posture at the time of the Data Breach — including which of the foregoing safeguards WM had deployed, which it had not, when its systems were first accessed without authorization, how long the threat actor remained undetected, and what Private Information was accessed — are facts peculiarly within WM's possession, custody, and control. WM has not disclosed them to Plaintiff, to Class Members, or to the public. Plaintiff therefore alleges upon information and belief that WM failed to implement one or more of the foregoing safeguards, and that its failure to do so

permitted the threat actor to obtain access to WM's systems, to remain within those systems undetected, and to exfiltrate the Private Information of Plaintiff and the Class. Plaintiff will identify WM's specific failures with further particularity following discovery.

72. These safeguards are not aspirational. They are codified in the frameworks that define reasonable cybersecurity readiness across industries, each of which WM failed to satisfy:

a. The NIST Cybersecurity Framework 2.0, including without limitation GV.OC-03, GV.PO-01, GV.SC-01, GV.SC-05, GV.SC-07, ID.AM-01, ID.AM-02, ID.AM-07, ID.AM-08, ID.RA-01, ID.RA-08, ID.IM-04, PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.AT-02, PR.DS-01, PR.DS-02, PR.DS-10, PR.DS-11, PR.PS-01, PR.PS-02, PR.PS-04, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, DE.AE-02, DE.AE-03, DE.AE-08, RS.MA-01, RS.AN-03, RS.CO-02, and RC.RP-03;[54]

b. The Center for Internet Security's Critical Security Controls, Version 8.1, a consensus set of prioritized defensive measures maintained by the Center for Internet Security and updated as attacker tradecraft evolves. Version 8 consolidated the framework's previous 20 Controls into 18, reorganizing them around defensive activities rather than device categories to account for cloud, hybrid, and remote-work environments; it merged the former Controls governing administrative privileges and account monitoring into Controls 5 and 6, merged email and web browser protections into Control

[54] Nat'l Inst. of Standards & Tech., U.S. Dep't of Com., *The NIST Cybersecurity Framework (CSF) 2.0*, NIST CSWP 29 (Feb. 26, 2024), https://doi.org/10.6028/NIST.CSWP.29 (last visited Oct. 26, 2026).

9, and added Control 15 (Service Provider Management) to address third-party and supply-chain risk. Version 8.1, released in 2024, realigned the Controls to the NIST Cybersecurity Framework 2.0 and added the Govern security function. WM failed to implement the Controls applicable to its environment, including without limitation Control 1 (Inventory and Control of Enterprise Assets), Control 2 (Inventory and Control of Software Assets), Control 3 (Data Protection), Control 4 (Secure Configuration of Enterprise Assets and Software), Control 5 (Account Management), Control 6 (Access Control Management), Control 7 (Continuous Vulnerability Management), Control 8 (Audit Log Management), Control 9 (Email and Web Browser Protections), Control 10 (Malware Defenses), Control 11 (Data Recovery), Control 12 (Network Infrastructure Management), Control 13 (Network Monitoring and Defense), Control 14 (Security Awareness and Skills Training), Control 15 (Service Provider Management), and Control 17 (Incident Response Management);[55]

c. CISA's Cross-Sector Cybersecurity Performance Goals, Version 2.0, which identify the highest-priority baseline practices — including phishing-resistant multifactor authentication, least privilege, network segmentation, mitigation of known exploited vulnerabilities, and tested backups — as

[55]Ctr. for Internet Sec., *CIS Critical Security Controls Version 8.1* (2024), https://www.cisecurity.org/controls/v8-1 (last visited Oct. 26, 2026); Ctr. for Internet Sec., *CIS Controls v8 Change Log* (2021), https://www.cisecurity.org/white-papers/cis-controls-v8-change-log/ (last visited Oct. 26, 2026).

achievable at modest cost and complexity by organizations of any size;[56] and

d. ISO/IEC 27001:2022 and ISO/IEC 27002:2022, the international standards for information security management systems and controls.

73. Enforcement authorities charged with policing data-security obligations treat these frameworks as the measure of reasonable security rather than as optional guidance. Texas, where WM is headquartered, requires by statute that a business "implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by the business in the regular course of business." Tex. Bus. & Com. Code Ann. § 521.052(a). The California Attorney General, applying a comparable mandate, has concluded that the CIS Critical Security Controls establish the minimum level of information security that any organization collecting or maintaining personal information should meet, and that failure to implement the Controls applicable to an organization's environment "constitutes a lack of reasonable security."[57] That conclusion addressed the 20 Controls then in effect, each of which is now subsumed within the 18 Controls of Version 8.1.[58] None of these authorities binds this Court. Each is cited as evidence of the standard of care to which organizations holding Private Information are held.

///

///

---

[56]Cybersecurity & Infrastructure Sec. Agency, *Cross-Sector Cybersecurity Performance Goals, Version 2.0* (Dec. 2025), https://www.cisa.gov/cybersecurity-performance-goals-2-0-cpg-2-0 (last visited Oct. 26, 2026).

[57]Cal. Dep't of Justice, *California Data Breach Report* 30 (Feb. 2016), https://oag.ca.gov/sites/all/files/agweb/pdfs/dbr/2016-data-breach-report.pdf (last visited Oct. 26, 2026).

[58]*See* Ctr. for Internet Sec., *CIS Controls v8 Change Log*, *supra* note 55.

***Common Injuries and Damages***

74. As a result of WM's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in WM's possession and is subject to further unauthorized disclosures so long as WM fails to undertake appropriate and adequate measures to protect the Private Information.

***The Data Breach Increases Victims' Risk of Identity Theft***

75. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

76. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity-theft-related crimes discussed below.

77. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

78. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk. For example, North Carolina has passed a law stating that "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[59]

79. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[60]

80. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[61] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction,

---

[59] N.C. Gen. Stat. § 132-1.10(a)(1).

[60] Husayn Kassai, *Banks Need to Stop Relying on Social Security Numbers*, Am. Banker (Nov. 12, 2018), https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers (last visited Oct. 26, 2026).

[61] *Just 5 Banks Prohibit Use of Social Security Numbers*, N.Y. Times: Bucks Blog (Mar. 20, 2013), https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/ (last visited Oct. 26, 2026).

"[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."[62]

81. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages. "Fullz" is fraudster slang for a package of data about a single victim that may include the victim's name, address, Social Security number, date of birth, and payment card information; the more complete the package, the more it commands on criminal marketplaces.[63]

82. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

83. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package.

84. Then, this comprehensive dossier can be sold and resold in perpetuity to crooked operators and other criminals (like illegal and scam telemarketers).

---

[62] Nikkita Walker, *What Can Someone Do With Your Social Security Number?*, Credit.com (Oct. 19, 2023), https://credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597 (last visited Oct. 26, 2026).

[63] *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, *Krebs on Security* (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited Oct. 26, 2026).

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

85. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm, yet the resource and asset of time has been lost.

86. Thus, due to the actual and imminent risk of identity theft, WM, in its Notice Letter, instructs Plaintiff and Class Members to protect themselves by reviewing account statements and monitoring their credit reports, in addition to enrolling in the offered credit monitoring program.

87. WM's extensive suggestion of steps that Plaintiff and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiff and Class Members must undertake in response to the Data Breach. Plaintiff's and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiff and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of WM's Notice Letter.

88. Plaintiff and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, freezing their payment cards, contacting credit bureaus to place freezes on their accounts, and monitoring their financial accounts for any indication of fraudulent activity, which may take years to detect. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer

actual injury in the form of lost time — which cannot be recaptured — spent on mitigation activities.

89. Plaintiff's mitigation efforts are consistent with the findings of the GAO, which released a report in 2007 regarding data breaches ("GAO Report") noting that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[64]

90. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

***Diminution of Value of Private Information***

91. Private Information is a valuable property right, considering the value of Big Data in corporate America and the consequences of cyber thefts including heavy prison sentences.[65] Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

92. An active and robust legitimate marketplace for Private Information also exists. As of 2019, the data brokering industry was estimated to generate more than $200 billion in annual

[64] *GAO Report, supra* note 52, at 2.

[65] *See generally* John T. Soma *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11 (2009).

revenue.[66] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[67]

93. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

94. WM was, or should have been, fully aware of the unique type and the significant volume of data on WM's network, amounting to, upon information and belief, thousands to tens of thousands of individuals detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

95. The injuries to Plaintiff and Class Members were directly and proximately caused by WM's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

///

///

[66]Urbano Reviglio, *The Untamed and Discreet Role of Data Brokers in Surveillance Capitalism: A Transnational and Interdisciplinary Overview*, 11 Internet Pol'y Rev. 1 (2022), https://doi.org/10.14763/2022.3.1670 (citing David Lazarus, *Column: Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. Times (Nov. 5, 2019)).
[67]Nielsen, *Computer & Mobile Panel: Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Oct. 26, 2026).

***Future Costs of Credit and Identity Theft Monitoring Are Reasonable and Necessary***

96. Fraud resulting from a data breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employee-benefit management company of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

97. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

98. Retail credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from WM's Data Breach.

***Loss of Benefit of the Bargain***

99. Furthermore, WM's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

100. Plaintiff and Class Members understood and expected that WM maintained adequate data security to protect the Private Information they were required to provide.

101. In fact, WM did not provide the expected data security. Accordingly, Plaintiff and Class Members received employment of a lesser value than what they reasonably expected to receive under the bargains struck with WM.

***Plaintiff Jonathan Margolis's Experience***

102. Plaintiff Jonathan Margolis is, and at all relevant times was, a resident and citizen of the Commonwealth of Pennsylvania, residing in Audubon, Pennsylvania. Mr. Margolis worked for WM from approximately October 2020 until November 2020.

103. As a condition of his employment, WM required Mr. Margolis to provide his Private Information, including his Social Security number, and he provided it to WM to obtain that employment. Upon information and belief, WM continued to maintain Mr. Margolis's Private Information on its systems after his employment ended, and was still doing so at the time of the Data Breach, more than five and one-half years later.

104. Mr. Margolis received the Notice Letter, dated November 6, 2026, on or about November 6, 2026. The Notice Letter informed Mr. Margolis that his sensitive personal information may have been affected and that "[s]uch sensitive personal information includes your Social Security Number."[68]

105. The only remediation WM offered was 24 months of credit monitoring and identity protection services through Cyberscout, a TransUnion company, in which Mr. Margolis must enroll himself within 90 days of the date of the Notice Letter. That offer is inadequate. Mr. Margolis's Social Security number cannot be changed, and the risk of its criminal misuse does not expire after 24 months; WM's own enrollment instructions state that "[t]he enrollment requires an internet connection and e-mail account";[69] and credit monitoring does nothing to prevent misuse of Private Information that an unauthorized party had been able to access since as early as June 17, 2026.

106. Mr. Margolis greatly values his privacy and is very careful about sharing his sensitive Private Information.

---

[68]Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals, *supra* note 2, at 1.
[69]Letter from USA Waste-Mgmt. Res., LLC to Affected Individuals, *supra* note 2, at 2.

107. Since the Data Breach, Mr. Margolis has experienced a marked increase in spam emails, telephone calls, and text messages. Upon information and belief, this increase is a direct result of the Data Breach.

108. The Data Breach has caused Mr. Margolis and his wife tremendous stress and anxiety.

109. As a result of the Data Breach, Mr. Margolis has spent approximately two hours to date researching the Data Breach and taking other steps to protect himself. Mr. Margolis plans to freeze his credit and will carefully review his financial statements going forward. The Notice Letter encouraged him "to remain vigilant against incidents of identity theft and fraud, to review your account statements, and to monitor your credit reports for suspicious activity,"[70] a burden WM's conduct shifted onto him. Mr. Margolis anticipates spending additional time on an ongoing basis to mitigate and address the harms caused by the Data Breach.

110. Mr. Margolis suffered actual injury from having his Private Information compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of his Private Information, a form of property that WM obtained from him; (b) violation of his privacy rights; (c) actual misuse of his Private Information in the form of increased spam emails, telephone calls, and text messages; (d) lost time; (e) emotional distress; and (f) present, imminent, and impending injury arising from the increased risk of fraud and identity theft.

111. Mr. Margolis has a continuing interest in ensuring that his Private Information, which remains in WM's possession years after his employment ended, is protected and safeguarded from future data breaches.

[70] *Id.*

112. Mr. Margolis would not have provided his Private Information to WM had he known that WM would maintain it using inadequate data security, retain it for years after his employment ended, and fail to notify him for more than two months after discovering that its systems had been compromised.

## CLASS ACTION ALLEGATIONS

113. Plaintiff brings this class action on behalf of himself and on behalf of all others similarly situated pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

114. The Class that Plaintiff seeks to represent is defined as follows:

115. **Nationwide Class**: All individuals residing in the United States whose Private Information was accessed, acquired, or taken by an unauthorized party as a result of the Data Breach, including all persons to whom WM sent notice of the Data Breach (the "Class," and individuals constituting the Class to be referred to as the "Class Members").

116. Excluded from the Class are the following individuals and/or entities: WM and WM's parents, subsidiaries, affiliates, officers and directors, and any entity in which WM has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

117. Plaintiff reserves the right to amend the definition of the Class if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

118. The proposed Class meets the criteria for certification under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3): it is sufficiently numerous and ascertainable by reference

to WM's own breach-notification list, common questions of law and fact predominate over individual questions, Plaintiff's claims are typical of those of the Class, Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

***Numerosity:***

119. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. WM reported that the Data Breach affected 6,875 Texans and 1,292 South Carolina residents, and WM also reported the Data Breach to the California Attorney General. Upon information and belief, Notice Letters were sent to individuals residing in numerous states. The precise number and identity of Class Members are not presently known to Plaintiff but are ascertainable from WM's own records.

***Commonality and Predominance:***

120. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members are the following:

a. Whether and to what extent WM had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether WM had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether WM had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether WM failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. Whether WM adequately trained its personnel to recognize and resist social engineering;

f. Whether WM retained the Private Information of former employees longer than was reasonably necessary;

g. Whether and when WM actually learned of the Data Breach;

h. Whether WM adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

i. Whether WM violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

j. Whether WM failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

k. Whether WM adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

l. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of WM's wrongful conduct; and

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

///

///

***Typicality:***

121. Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct — the same intrusion into WM's systems, the same failure to implement reasonable security, and the same delayed notice — and now suffers from the same violations of the law as each other member of the Class.

***Policies Generally Applicable to the Class:***

122. This class action is also appropriate for certification because WM acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. WM's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on WM's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

***Adequacy:***

123. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members, and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

///

///

***Superiority and Manageability:***

124. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like WM. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

125. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because WM would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

126. The litigation of the claims brought herein is manageable. WM's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members

demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

127. Adequate notice can be given to Class Members directly using information maintained in WM's records.

128. Unless a Class-wide injunction is issued, WM may continue in its failure to properly secure the Private Information of Class Members, WM may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and WM may continue to act unlawfully as set forth in this Complaint.

129. Further, WM has acted on grounds that apply generally to the Class as a whole, so that class certification and injunctive relief are appropriate on a class-wide basis.

130. Likewise, particular common issues are appropriate for certification under Federal Rule of Civil Procedure 23(c)(4) because such issues are common to the Class, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether WM failed to timely notify Plaintiff and the Class of the Data Breach;

b. Whether WM owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether WM's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether WM's failure to institute adequate protective security measures amounted to negligence;

e. Whether WM failed to take commercially reasonable steps to safeguard Plaintiff's and Class Members' Private Information; and

f. Whether adherence to FTC data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

## COUNT I

## NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

131. Plaintiff incorporates and realleges all allegations in the paragraphs above.

132. WM solicited, gathered, and stored the Private Information of Plaintiff and Class Members.

133. Upon accepting and storing the Private Information of Plaintiff and Class Members on its computer systems and networks, WM undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information of Plaintiff and the Class from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

134. WM had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed. Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in WM's possession. As such, a special relationship existed between WM and Plaintiff and the Class.

135. WM required Plaintiff and Class Members to provide their Private Information, including names and Social Security numbers, as a condition of their employment.

136. Implied in these exchanges was a promise by WM to ensure that the Private Information of Plaintiff and Class Members in its possession was only used for the provided purpose and that WM would destroy any Private Information that it was not required to maintain.

137. WM had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

138. WM had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139. WM owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

140. WM's duty of care to use reasonable security measures arose as a result of the special relationship that existed between WM and Plaintiff and Class Members.

141. WM's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because WM is bound by industry standards to protect confidential Private Information.

142. WM was subject to an "independent duty," untethered to any contract between WM and Plaintiff or the Class.

143. WM also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain pursuant to regulations.

144. Moreover, WM had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

145. WM had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within WM's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

146. WM breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by WM include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately train its personnel to recognize and resist social engineering;

c. Failing to require phishing-resistant multifactor authentication and to limit employees' access to Private Information to what their jobs required;

d. Failing to adequately monitor the security of its networks and systems;

e. Allowing unauthorized access to Class Members' Private Information;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

g. Failing to delete Private Information it was no longer required to retain pursuant to regulations, including the Social Security numbers of former employees whose employment had ended years earlier; and

h. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

147. WM violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. WM's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

148. WM's violation of Section 5 of the FTC Act is evidence of WM's negligence.

149. Plaintiff and Class Members were within the class of persons the FTC Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

150. The FTC has pursued enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

151. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of WM's inadequate security practices.

152. It was foreseeable that WM's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of

security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting companies in possession of Private Information.

153. WM has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

154. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. WM knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on WM's systems.

155. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

156. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, WM's possession.

157. WM was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

158. WM's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B (1965). Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

159. WM has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

160. But for WM's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

161. There is a close causal connection between WM's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of WM's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

162. As a direct and proximate result of WM's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in WM's possession and is subject to further unauthorized disclosures so long as WM fails to undertake appropriate and adequate measures to protect the Private Information.

163. As a direct and proximate result of WM's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

164. Additionally, as a direct and proximate result of WM's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in WM's possession and is subject to further unauthorized disclosures so long as WM fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

165. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

166. WM's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

167. Plaintiff and Class Members are also entitled to injunctive relief requiring WM to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II

### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

168. Plaintiff incorporates and realleges all allegations in the paragraphs above.

169. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by WM of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of WM's duty. WM's duties are further defined by

state statutes enacted to protect the same class of persons from the same category of harm, including Tex. Bus. & Com. Code Ann. § 521.052(a), which requires a business to implement and maintain reasonable procedures to protect from unlawful use or disclosure any sensitive personal information collected or maintained by the business in the regular course of business; and Tex. Bus. & Com. Code Ann. § 521.053(b), which requires disclosure of a breach without unreasonable delay and in each case not later than the 60th day after the date on which the person determines that the breach occurred.

170. WM violated Section 5 of the FTC Act and the state statutes identified above by failing to use reasonable measures to protect Private Information, by failing to comply with industry standards, and by failing to provide notice of the Data Breach without unreasonable delay. WM's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, its practice of requiring employees to provide that Private Information as a condition of employment, and the foreseeable consequences of a data breach on its systems.

171. WM's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

172. Plaintiff and Class Members are within the class of persons Section 5 of the FTC Act (and similar state statutes) is intended to protect.

173. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

174. As a direct and proximate result of WM's conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in WM's possession and is subject to further unauthorized disclosures so long as WM fails to undertake appropriate and adequate measures to protect the Private Information.

175. Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

## COUNT III

### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

176. Plaintiff incorporates and realleges all allegations in the paragraphs above.

177. Plaintiff and Class Members who are current or former employees of WM were required to provide their Private Information to WM as a condition of their employment. WM accepted and retained that Private Information.

178. In requiring and accepting Plaintiff's and Class Members' Private Information, WM impliedly promised to implement reasonable data security practices, procedures, and protocols to safeguard that Private Information, to use it only for legitimate business purposes, to

delete it once it was no longer needed, and to provide timely notice of any breach. In requiring the mandatory production of Social Security numbers, WM assented to protect that information.

179. Plaintiff and Class Members accepted WM's offer and fully performed their obligations under the implied contract, including by providing their Private Information and their labor. Plaintiff and Class Members would not have provided their Private Information to WM absent WM's implied promise to safeguard it.

180. WM materially breached the implied contract by failing to implement reasonable data security measures, by allowing an unauthorized third party to obtain Plaintiff's and Class Members' Private Information, and by failing to provide timely notice of the Data Breach.

181. As foreseen, Plaintiff and the Class were harmed by WM's failure to use reasonable data security measures to securely store and protect the files in its care, including, but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

182. As a direct and proximate result of WM's breach of the implied contract, Plaintiff and Class Members are entitled to damages, including compensatory and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT IV

### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

183. Plaintiff incorporates and realleges all allegations in the paragraphs above.

184. This Count is pleaded in the alternative to Count III.

185. Plaintiff and Class Members who are current or former employees of WM conferred a monetary benefit on WM in the form of their labor. A portion of the value of that labor was exchanged, as WM understood, for WM's obligation to maintain the confidentiality and security of the Private Information WM required them to provide as a condition of employment.

Plaintiff and Class Members also conferred a benefit on WM by providing Private Information that WM used to operate its business, including to employ and pay its workforce.

186. WM knew of and appreciated the benefits conferred by Plaintiff and Class Members. WM required the Private Information as a condition of employment, accepted and retained Plaintiff's and Class Members' labor, and knew that Plaintiff and Class Members provided their Private Information and their labor with the reasonable expectation that WM would safeguard their Private Information.

187. Upon information and belief, WM funds its data security measures from the revenue generated by its workforce's labor, and WM enriched itself by saving the costs it reasonably should have spent on data security measures to protect Plaintiff's and Class Members' Private Information.

188. It would be inequitable for WM to retain the benefit of Plaintiff's and Class Members' Private Information without adequately compensating Plaintiff and Class Members for the value of that benefit, particularly given WM's failure to safeguard that Private Information.

189. WM's failure to use reasonable data security measures that could have prevented the Data Breach means that WM's retention of the benefit conferred by Plaintiff and Class Members, without adequately safeguarding their Private Information in return, is unjust.

190. As foreseen, Plaintiff and the Class were harmed by WM's failure to use reasonable data security measures to securely store and protect the files in its care, including, but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

191. As a direct and proximate result of WM's unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of the benefit conferred upon WM, in an

amount to be proven at trial, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution.

## COUNT V

### DECLARATORY JUDGMENT
### (On Behalf of Plaintiff and the Class)

192. Plaintiff incorporates and realleges all allegations in the paragraphs above.

193. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and common law described in this Complaint.

194. WM owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

195. Upon information and belief, WM still possesses Private Information regarding Plaintiff and Class Members.

196. Plaintiff alleges that WM's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his Private Information, and the risk remains that further compromises of his Private Information will occur in the future.

197. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. WM owes a legal duty to secure Plaintiff's and Class Members' Private Information from unauthorized disclosure and theft;

b. WM's existing security measures do not comply with its implicit contractual obligations and duties of care to provide reasonable security

procedures and practices that are appropriate to protect Plaintiff's and Class Members' Private Information; and

c. WM continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' Private Information.

198. This Court should also issue corresponding prospective injunctive relief requiring WM to employ adequate security protocols consistent with legal and industry standards to protect Plaintiff's and Class Members' Private Information, including the following:

a. Order WM to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members; and

b. Order that, to comply with WM's explicit or implicit contractual obligations and duties of care, WM must implement and maintain reasonable security measures, including, but not limited to:

1) engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on WM's systems on a periodic basis, and ordering WM to promptly correct any problems or issues detected by such third-party security auditors;

2) engaging third-party security auditors and internal personnel to run automated security monitoring;

3) auditing, testing, and training its security personnel regarding any new or modified procedures;

4) segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of WM's systems;

5) conducting regular database scanning and security checks;

6) routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

7) training its personnel to recognize and resist social engineering and requiring phishing-resistant multifactor authentication for access to systems containing Private Information;

8) routinely and continually purging all data that is no longer necessary in order to adequately conduct its business operations; and

9) meaningfully educating its employees about the threats they face with regard to the security of their Private Information, as well as the steps Plaintiff and Class Members should take to protect themselves.

199. If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at WM. The risk of another such breach is real, immediate, and substantial. If another breach at WM occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

200. The hardship to Plaintiff if an injunction does not issue exceeds the hardship to WM if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of WM's

compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and WM has a pre-existing legal obligation to employ such measures.

201. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at WM, thus preventing future injury to Plaintiff and other individuals whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an order certifying the Class, as defined herein, pursuant to Fed. R. Civ. P. 23, and appointing Plaintiff as Class Representative and his counsel as Class Counsel pursuant to Fed. R. Civ. P. 23(g);

B. For declaratory relief as requested in Count V, and for equitable relief enjoining WM from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting WM from engaging in the wrongful and unlawful acts described herein;

ii. requiring WM to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring WM to delete, destroy, and purge the Private Information of Plaintiff and Class Members unless WM can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring WM to adopt and follow a written retention schedule under which former employees' Private Information is deleted once no legal requirement or legitimate business purpose supports retaining it;

v. requiring WM to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

vi. requiring WM to maintain the Private Information of Plaintiff and Class Members only on systems employing industry-standard security controls, including encryption;

vii. requiring WM to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on WM's systems on a periodic basis, and ordering WM to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring WM to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring WM to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring WM to segment data by, among other things, creating firewalls and access controls so that if one area of WM's network is compromised, hackers cannot gain access to other portions of WM's systems;

xi. requiring WM to conduct regular database scanning and security checks;

xii. requiring WM to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

xiii. requiring WM to train its personnel to recognize and resist social engineering, including through practical exercises, and to require phishing-resistant multifactor authentication for access to systems containing Private Information;

xiv. requiring WM to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xv. requiring WM to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees'

compliance with WM's policies, programs, and systems for protecting Private Information;

xvi. requiring WM to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor WM's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvii. requiring WM to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xviii. requiring WM to implement logging and monitoring programs sufficient to track traffic to and from WM's servers;

xix. requiring WM, for a period of 10 years, to engage a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate WM's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees and costs as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. For such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff, on behalf of himself and the putative Class, hereby demands a trial by jury on all claims so triable pursuant to Fed. R. Civ. P. 38(b).

Dated: November 21, 2026

Respectfully submitted,

By: */s/ Andrew A. Snyder*

Andrew A. Snyder (Attorney-in-charge)
Texas Bar No. 24102997
S.D. Texas Bar No. 3914830
**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Sacramento, CA 95825
(916) 823-6955 (Tel)
(206) 441-9711 (Fax)
andrew@emeryreddy.com

M. Anderson Berry*
Gregory Haroutunian*
Jackson Stephens*
**EMERY | REDDY, PC**
333 University Avenue, Suite 200
Sacramento, CA 95825
(916) 823-6955 (Tel)
(206) 441-9711 (Fax)
anderson@emeryreddy.com
gregory@emeryreddy.com
jackson@emeryreddy.com

**Pro hac vice* forthcoming

*Attorneys for Plaintiff and the Putative Class*